ACCEPTED
03-15-00242-CV
7830504
THIRD COURT OF APPEALS
AUSTIN, TEXAS
11/13/2015 4:57:29 PM
JEFFREY D. KYLE
CLERK

Case Number 03-15-00242-CV

IN THE THIRD DISTRICT COURT OF APPEALS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
11/13/2015 4:57:29 PM
JEFFREY D. KYLE
Clerk

at Austin

---

**GUILLERMO OCHOA-CRONFEL**,
Appellant,

v.

**PATRICK C. MURRAY**,
Appellee.

_____

From Cause Number D-1-GN-11-002136 in the 345th Judicial District Court
of Travis County

_____

**BRIEF OF APPELLEE**

_____


**WALTERS, BALIDO & CRAIN, L.L.P.**

**Gregory R. Ave**
State Bar Number 01448900
greg.ave@wbclawfirm.com
10440 North Central Expressway, Suite 1500
Dallas, Texas 75231
Telephone Number (214) 347-8310
Facsimile Number (214) 347-8311

ATTORNEYS FOR APPELLEE
PATRICK C. MURRAY

**November 13, 2015**

# LIST OF PARTIES AND THEIR COUNSEL

Pursuant to Texas Rule of Appellate Procedure 38.1(a) and 38.2(a)(1)(A), the following are the parties to the trial court's final judgment being appealed and their counsel:

1.    Appellant:                Guillermo Ochoa-Cronfel;

2.    Counsel for Appellant:    Paul T. Morin, Esquire
(trial and appellant counsel)
Paul T. Morin, P.C.
503 West 14th Street
Austin, Texas 78701;

                                          Guillermo Ochoa-Cronfel, Esquire
(appellant counsel)
The Cronfel Law Firm
2700 Bee Caves Road, Suite 103
Austin, Texas 78746

                                          Chris Cagle, Esquire
(trial counsel)
The Cagle Law Firm, P.C.
4425 South Mopac Expressway
Building II, Suite 105
Austin, Texas 78735

3.    Appellee:                 Patrick C. Murray;

4.    Counsel for Appellee:     Gregory R. Ave (appellate counsel)
Jay R. Harris (appellate counsel)
Walters, Balido & Crain, L.L.P.
Meadow Park Tower, Suite 1500
10440 North Central Expressway
Dallas, Texas 75231;

Brett Payne (trial counsel)
Katherine Sacra McLean (trial counsel)
Walters, Balido & Crain, L.L.P.
9020 North Capitol of Texas Highway
Building II, Suite 225
Austin, Texas 78759; and

5.     Trial Judge:                    The Honorable Amy Clark Meachum,
                                       Presiding Judge of the 345th Judicial
                                       District Court of Travis County

For clarity and convenience, Appellant Guillermo Ochoa-Cronfel will be referred to as "Cronfel"; Appellee Patrick C. Murray will be referred to as "Murray"; and the Honorable Amy Clark Meachum, Presiding Judge of the 345th Judicial District Court of Travis County, will be referred to as the "trial court."

The record on appeal consists of a one-volume Clerk's Record which will be cited by page number as "[CR __]," a one-volume Supplemental Clerk's Record which will be cited by page number as "[SCR __]," and a seven-volume Reporter's Record which will be cited as "[__ RR __]."

# STATEMENT REGARDING ORAL ARGUMENT

This matter presents no novel or complex issues. Oral argument is unnecessary because the dispositive issues have been authoritatively decided and the facts and legal arguments are adequately presented in the briefs and record. Moreover, the Court's decisional process would not be significantly aided by oral argument. In this regard, oral argument would not clarify the parties' written arguments or help the Court understand the issues presented, as the briefing has accomplished this. Nevertheless, should the Court elect to hear oral argument regarding this matter, Murray respectfully asks for the opportunity to present same.

# TABLE OF CONTENTS

**LIST OF PARTIES AND THEIR COUNSEL**......................................................i

**STATEMENT REGARDING ORAL ARGUMENT**.....................................iii

**TABLE OF CONTENTS**...................................................................................iv

**TABLE OF AUTHORITIES**.............................................................................vi

**STATEMENT OF THE CASE**...........................................................................xi

**ISSUES PRESENTED FOR REVIEW**................................................................xii

**STATEMENT OF FACTS**..................................................................................1

      1.     Cronfel's Lawsuit ...............................................................................1
      2.     The Discovery Sanction ....................................................................2
      3.     The Trial & Jury Verdict ..................................................................10
      4.     Cronfel's Expert Testified as to His Previous and Subsequent Wrist Injuries, as Well as History of Sporadic Treatment ........................................................................13
      5.     Cronfel's Testimony Lacked Credibility .........................................29

**SUMMARY OF THE ARGUMENT** .................................................................39

**ARGUMENTS AND AUTHORITIES** ..............................................................40

      A.    The Standard of Review ..................................................................40

         1.    Legal Sufficiency .........................................................................40
         2.    Factual Sufficiency – Against the Great Weight and Preponderance of the Evidence ...........................................42
         3.    A Court May Not Substitute Its Judgment for that of the Jury's .............................................................................44

B.      The Jury's Negligence Finding as to Cronfel Is Supported By Legally and Factually Sufficient Evidence ..............................46

C.      The Evidence Is Factually Sufficient to Support the Jury's Damage Awards ................................................................52

D.      The Trial Court's Discovery Sanction Was Not an Abuse of Discretion ................................................................63

**CONCLUSION AND PRAYER** ........................................................68

**CERTIFICATE OF COMPLIANCE** .................................................70

**CERTIFICATE OF SERVICE** .........................................................71

# TABLE OF AUTHORITIES

## Cases

*Armadillo Bail Bonds v. State*, 802 S.W.2d 237 (Tex. Crim. App. 1990) ...........65

*Barrajas v. VIA Metro. Transit Auth.*,
945 S.W.2d 207 (Tex. App.–San Antonio 1997, no writ)..................................62

*Barrios v. King Fisher Marine Serv., L.P.*,
2010 Tex. App. LEXIS 3955 (Tex. App.–Corpus Christi
May 27, 2010, pet. denied) .............................................................. 62-63

*In re Bennett*, 960 S.W.2d 35 (Tex. 1997) .........................................................65

*Berry-Parks Rental Equip. Co. v. Sinsheimer*,
842 S.W.2d 754 (Tex. App.–Houston [1st Dist.] 1992, no writ) ......................67

*Braden v. Downey*, 811 S.W.2d 922 (Tex. 1991)....................................................66

*Bradford v. Vento*, 48 S.W.3d 749 (Tex. 2001)......................................................42

*Briones v. Levine's Dep't Store, Inc.*, 446 S.W.2d 7 (Tex. 1969) ..........................45

*Broesche v. Jacobson*,
218 S.W.3d 267 (Tex. App.–Houston [14th Dist.] 2007, pet. denied).............67

*Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497 (Tex. 1995) ...........................42

*Cain v. Bain*, 709 S.W.2d 175 (Tex. 1986) ..........................................................46

*Chrysler Corp. v. Blackmon*, 841 S.W.2d 844 (Tex. 1992)....................................66

*City of Keller v. Wilson*, 168 S.W.3d 802 (Tex. 2005) ..............................40, 41, 44

*Clancy v. Zale Corp.*,
705 S.W.2d 820 (Tex. App.–Dallas 1986, writ ref'd n.r.e.) ..............................45

*Croucher v. Croucher*, 660 S.W.2d 55 (Tex. 1983)........................................... 41-42

*Crow v. Burnett*, 951 S.W.2d 894 (Tex. App.–Waco 1997, writ denied) .........62

*Dallas County Constable v. Kingvision Pay-Per-View*,
 219 S.W.3d 602 (Tex. App.–Dallas 2007, no pet.)...............................................65

*Dawson v. Briggs*,
107 S.W.3d 739 (Tex. App.–Fort Worth 2002, no pet.)...................................52

*In re Does 1-10*, 242 S.W.3d 805 (Tex. App.–Texarkana 2007, no pet.)..........64

*Dow Chem. Co. v. Francis*, 46 S.W.3d 237 (Tex. 2001) ........................................42

*Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750 (Tex. 1993) .....................................44

*Eberle v. Adams*,
73 S.W.3d 322 (Tex. App.–Houston [1st Dist.] 2001, pet. denied) ................46

*Eichelberger v. Eichelberger*, 582 S.W.2d 395 (Tex. 1979)....................................65

*Finlan v. Peavy*, 205 S.W.3d 647 (Tex. App.–Waco 2006, no pet.) ...................65

*Ford Motor Co. v. Ridgway*, 135 S.W.3d 598 (Tex. 2004) .............................40, 41

*Garza v. Alviar*, 395 S.W.2d 821 (Tex. 1965)......................................................43

*Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757 (Tex. 2003)....................44

*Gonzalez v. Wal-Mart Stores, Inc.*,
143 S.W.3d 118 (Tex. App.–San Antonio 2004, no pet.)..................................62

*Greiner v. Jameson*,
865 S.W.2d 493 (Tex. App.–Dallas 1993, writ denied) ....................................67

*Herbert v. Herbert*, 754 S.W.2d 141 (Tex. 1988)..................................................45

*Hooper v. Smallwood*,
270 S.W.3d 234 (Tex. App.–Texarkana 2008, pet. denied) ..............................42

*Hyler v. Boytor*,
823 S.W.2d 425 (Tex. App.–Houston [1st Dist.] 1992, no writ) ......................62

*IFC Credit Corp. v. Specialty Optical Sys.*,
252 S.W.3d 761 (Tex. App.–Dallas 2008, pet. denied)......................................65

*Ins. Network of Tex. v. Kloesel*,
266 S.W.3d 456 (Tex. App.–Corpus Christi 2008, pet. denied)........................42

*In re K.A.R.*,
171 S.W.3d 705 (Tex. App.–Houston [14th Dist.] 2005, no pet.).....................65

*Kentucky Cent. Life Ins. Co. v. Fannin*,
575 S.W.2d 76 (Tex. Civ. App.–Amarillo 1978, no writ)..................................46

*Kutch v. Del Mar College*,
831 S.W.2d 506 (Tex. App.–Corpus Christi 1992, no writ)........................64, 65

*Lawrence v. Kohl*,
853 S.W.2d 697 (Tex. App.–Houston [1st Dist.] 1993, no pet.) ........................66

*Low v. Henry*, 221 S.W.3d 609 (Tex. 2007) ..........................................................66

*Luna v. Torres*, 2009 Tex. App. LEXIS 6972
(Tex. App.–Corpus Christi August 31, 2009, no pet.).......................................61

*M.D. Anderson Hosp. & Tumor Inst. v. Felter*,
837 S.W.2d 245 (Tex. App.–Houston [1st Dist.] 1992, no writ) ......................45

*McDonald v. Dankworth*,
212 S.W.3d 336 (Tex. App.–Austin 2006, no pet.).....................................*passim*

*McGuffin v. Terrell*,
732 S.W.2d 425 (Tex. Civ. App.–Fort Worth 1987, no writ)......................57, 62

*Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706 (Tex. 1997)....................42

*In re N.R.C.*,
94 S.W.3d 799 (Tex. App.–Houston [14th Dist.] 2002, pet. denied)...............64

*Oakley v. C.E. Duke's Wrecker Service,*
557 S.W.2d 810 (Tex. Civ. App.–Houston [1st Dist.] 1977,
writ ref'd n.r.e.)........................................................................................49

*Onstad v. Wright*,
54 S.W.3d 799 (Tex. App.–Texarkana 2001, pet. denied) ................................64

*Pilkington v. Kornell*,
822 S.W.2d 223 (Tex. App.–Dallas 1991, writ denied) .....................................52

*Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442 (Tex. 1989) ...........................43

*Pool v. Ford Motor Co.*, 715 S.W.2d 629 (Tex. 1986) .............................................43

*Public Util. Comm'n v. Cofer*, 754 S.W.2d 121 (Tex. 1988) .................................64

*Rash v. Whisennand*,
453 S.W.2d 353 (Tex. Civ. App.–Houston [14th Dist.] 1970,
writ ref'd n.r.e)..........................................................................................49

*Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*,
766 S.W.2d 264 (Tex. App. 1988, writ denied) .................................................43

*Scott Bader, Inc. v. Sandstone Prods.*,
248 S.W.3d 802 (Tex. App.–Houston [1st Dist.] 2008, no pet.) .......................67

*Silcott v. Oglesby*, 721 S.W.2d 290 (Tex. 1986) .....................................................44

*State v. PR Invs.*,
180 S.W.3d 654 (Tex. App.–Houston [14th Dist.] 2005)....................................67

*Thompson v. Davis*, 901 S.W.2d 939 (Tex. 1995) .....................................................67

*TransAmerican v. Powell*, 811 S.W.2d 913 (Tex. 1991) ..........................................67

*Traylor v. Goulding*, 497 S.W.2d 944 (Tex. 1973) ..................................................44

*Vaughn v. Tex. Employment Comm'n*,
792 S.W.2d 139 (Tex. App.–Houston [1st Dist.] 1990, no writ) .......................66

## **Other Authorities**

Texas Rule of Appellate Procedure 38.1(a) ..........................................................i

Texas Rule of Appellate Procedure 38.2(a)(1)(A)..................................................i

TEX. R. CIV. P. 215...................................................................................................66

TEX. R. CIV. P. 215.3................................................................................................66

**STATEMENT OF THE CASE**

This appeal arises from cause number D-1-GN-11-002136, styled *Guillermo Ochoa-Cronfel v. Patrick C. Murray*, pending in 345th Judicial District Court of Travis County, the Honorable Amy Clark Meachum presiding. The underlying lawsuit arose out of a purported collision between Cronfel's bicycle and Murray's dog on July 23, 2009. [CR 5.] During the course of discovery, Cronfel was sanctioned $5,000.00 for failing to comply with its written orders and necessitating numerous motions, hearings, and court intervention. [CR 413.]

Cronfel's claims proceeded to trial on November 17, 2014. [I RR 1]. The jury determined both Cronfel and Murray were negligent in causing the injuries at issue, attributed 55% of the responsibility to Murray and 45% to Cronfel, and determined Cronfel's past and future damages to be $18,345.00 as a result of the accident. [V RR 52-54.] The trial court entered its final judgment on the jury's verdict on January 28, 2015. [SCR 3-5.]

Thereafter, Cronfel filed a motion for judgment notwithstanding the verdict [CR 519-21], which the trial court denied [VI RR 4-14]. Cronfel also filed a motion for new trial [CR 527-34], which the trial court denied [CR 543]. Thereafter, Cronfel filed this appeal [CR 545-46].

# ISSUES PRESENTED FOR REVIEW

Cronfel's appeal presents the following issues for the Court's review:

1. Was there legally and factually sufficient evidence to support the jury's verdict attributing 45% of the responsibility for the accident to Cronfel?

2. Was there legally and factually sufficient evidence to support the jury's verdict as to amounts which would fairly and reasonably compensate Cronfel for his injuries, if any, that resulted from accident at issue?

3. Did the trial court abuse its discretion in imposing a sanction against Cronfel?

## STATEMENT OF FACTS

1. Cronfel's Lawsuit

On July 14, 2011, Cronfel brought suit against Murray because of a collision between Murray's dog and Cronfel's bicycle, which occurred almost two years earlier (on July 23, 2009) (the "accident"). [CR 4-8.] Cronfel subsequently filed his first amended petition (the live pleading), which described the accident as follows:

> 7. On or about July 23, 2009, [Cronfel] was riding his bicycle in his neighborhood . . .. On the same date and time, [Murray] was in the neighborhood walking his dog. [Murray's] dog, a German Shorthair hunting breed, got out of [Murray's] control and ran toward and jumped into [Cronfel's] bicycle. The collision knocked the front wheel of [Cronfel's] bicycle out from under him, causing him to fly off the bicycle and slam into the asphalt pavement, causing severe bodily injuries.
>
> 8. . . . [Murray] was the owner of the dog, that proximately caused [Cronfel's] injuries and damages. [Murray] allowed the dog to roam the neighborhood freely, and failed to control his dog in accordance with City of Austin laws and the applicable deed restrictions governing [Murray's] property within the Travis Country subdivision. As a result of [Murray's] conduct, [Cronfel] has suffered severe personal injuries and will require multiple surgical interventions.

[CR 13.]

Based on these factual allegations, Cronfel asserted negligence and negligence per se claims against Murray. [CR 13-14.] Cronfel further asserted the acts or omissions of Murray breached the homeowner's association restrictive covenants and regulations regarding control of pets which also was a proximate cause of his alleged injuries. [*Id.* at 14.]

2. The Discovery Sanction

The Clerk's Record includes the final motion for death penalty sanctions or alternatively motion to enforce order [starting at CR 176] and its attached exhibits [CR 185-354]. The exhibits attached to the death penalty motion are:

(1) Murray's initial motion to compel [CR 217-20] and its attached exhibits [CR 221-46];

(2) Murray's amended motion to compel [CR 248-52] and its attached exhibits [CR 253-325]; and

(3) Murray's motion to compel responses to the subpoena duces tecum served on Lown and motion to compel responses to Murray's second request for production of documents [CR 340-43] and its attached exhibits [CR 344-54].

Additionally, the record contains following orders and directives from the trial court related to the discovery sanction at issue:

(1)    the March 5, 2014 order granting Murray's motion and amended motion to compel and expressly "ordered [Cronfel] to provide a **fully executed**, Authorization to Disclose Protected Health Information by March 6, 2014 at noon and to further waive the notice period" [CR 327] (emphasis added);

(2)    the March 21, 2014 correspondence from the Honorable Judge Stephen Yelenosky in response to Cronfel's motion for emergency protection from discovery to protect privileged medical records wherein the trial court states:

> After my staff gave [Cronfel] a setting for this afternoon on [Cronfel's] Emergency Motion for Protection from Discovery to Protect Privileged Medical Records, I reviewed the motion. [Cronfel] has known since Judge Triana signed her order that he was to provide the releases **without the restrictions now sought**. [Cronfel] is charged with knowing that his medical records would contain at least some irrelevant material. So there is no emergency that has just arisen.

3

> Since the relief sought would be **contrary to Judge Triana's Order** Granting [Murray's] Motion to Compel, she is the judge you should contact if you wish to request a setting with her on the Central Docket or otherwise at her direction.

> [CR 338] (emphasis added);

(3)    the September 18, 2014 order instructing Cronfel to "produce a signed authorization releasing [Lown's] **complete** medical chart for [Cronfel] by tomorrow September 19, 2014" [CR 187; 382] (emphasis added); and

(4)    the October 31, 2014 order granting Murray's motion for sanctions and awarding same $5,000.00 in attorneys' fees to "cover the attorney's fees that [Murray] incurred in response to this motion and **all prior** underlying **hearings on prior motions to compel**, and in part **as sanctions for objectionable conduct, including but not limited to [Cronfel's] altering the authorization form attached to the Order of the Court, signed and filed on September 18, 2014** [CR 413] (emphasis added).

The tale of the discovery sanction begins with Murray's initial set of discovery served on Cronfel. Cronfel responded to Murray's initial set of discovery on August 6, 2012. [CR 202-15.] This discovery included the following interrogatory and response:

4

INTERROGATORY NO. 13: State the names, addresses and telephone number of all physicians or other practitioners of the medical arts who have examined or treated you in the past ten (10) years and please state for what ailment, disease, condition or injury you were treated by each such physician or practitioner and the approximate dates of such treatments.

ANSWER: [Cronfel] objects to Interrogatory number thirteen in that it requests [Cronfel's] private information in requesting treatment for matters that have nothing to do with this claim. Such information is not relevant nor shall it lead to the discovery of admissible evidence. Further the request for such information is harassing and overbroad, vague and ambiguous. **[Cronfel] had no prior injuries to his right forearm or right wrist.**

\* \* \*

INTERROGATORY NO. 16: Are you under the care of any physician or other health care providers at this time? lf so, please state the name, address and telephone number of all such physicians or health care providers.

ANSWER: [Cronfel] objects to Interrogatory number 16 in that it requests [Cronfel's] private information in requesting information for matters that have nothing to do with this claim. Such information is not relevant nor shall it lead to the discovery of admissible evidence. Further the request for such information is harassing and overbroad, vague and ambiguous. **[Cronfel] is currently under the care of [Ira Lown, M.D. ("Lown")] related to this incident, and his medical**

5

**records will be provided**.

[CR 208-9; emphasis added.]

This discovery also included the following request for production and response:

> 4. True and correct copies of the medical and/or employment authorization attached to the [Murray's] First Set of Interrogatories to [Cronfel].
>
> [Cronfel] objects to RFP number four in that it requests [Cronfel's] private information in requesting such information and that such information is not relevant nor shall it lead to the discovery of admissible evidence. Further the request for such information is harassing and overbroad, vague and ambiguous. **[Cronfel] will produce all medical records and billing records in the form of business records affidavit and medical billing records affidavits**.

[CR 213; emphasis added.]

By August 16, 2013, Cronfel had failed and refused to provide any medical records – despite his previous representation to contrary. [CR 177, 218.] Accordingly, Murray was forced to prepare and file a motion to compel. [CR 217-46.] Prior to this hearing, however, Cronfel and Murray reached an agreement that Cronfel would produce a complete copy of all of

his medical records, including those of Lown. [CR 249.] Although Cronfel produced some records, it was clear Cronfel had cherry-picked his records and only produced those favorable to his claim. [*Id.*] Cronfel's failure to fully respond became more apparent during the deposition of his medical expert, James Robison, IV, M.D., on February 18, 2014. [*Id.* at 249-50.]

Based on Dr. Robison's testimony, Murray served depositions on written questions on the medical providers identified by Dr. Robison. [CR 250.] Murray also sent correspondence to Cronfel requesting he waive the notice period so the records sought could be retrieved prior to the rapidly approaching trial date. [*Id.*] Cronfel did not respond, necessitating a second amended motion to compel. [CR 248.]

The trial court heard Murray's original and amended motions to compel and entered an order directing Cronfel to execute an unrestricted medical authorization, entitling Murray to obtain the complete medical records from the medical providers identified by Dr. Robison.[1] [CR 327.] Despite the trial court's explicit directive, Cronfel failed to provide the authorization by the date specified in the order. [CR 178; 329-30.]

---

[1] Dr. Walters (a hand specialist), Healthsound Hand Clinic, and Select Physical Therapy from January 2005 through the present (*i.e.*, March 2014).

7

On March 7, 2014, Cronfel finally provided Murray with a *limited* medical authorization in violation of the trial court's order. [*Id.*] Shortly thereafter, Cronfel sought to further limit Murray's discovery by filing an emergency motion for protection. [CR 332-34.] Cronfel asked the trial court to protect certain records which were obtained pursuant to his prior authorization. [*Id.*] However, the trial court rejected Cronfel's request stating Cronfel was fully aware since the entry of the prior order that he was to provide medical releases without the restrictions he was now seeking. [*Id.* at 338.] Critically, the medical records sought included those of Lown – Cronfel's testifying medical expert.

Murray then noticed Lown's deposition and included a subpoena *duces tecum*, seeking his complete medical chart regarding Cronfel. [*Id.* at 345-47.] However, Cronfel and Lown, although initially stating they would provide it [*Id.* at 349], later reneged on that promise and refused to provide the chart (as evidenced by Murray's motion to compel) [*Id.* at 340-43]. Thus, Murray filed a *third* motion to compel requesting the medical chart. [CR 176-84.] The trial court heard Murray's third motion on September 18, 2014, and ordered Cronfel "to produce a signed authorization releasing Dr. Ira Lown's complete medical chart for [Cronfel] by tomorrow, September

8

19, 2014." [CR 187; 382.]

In addition to sending the foregoing order to Cronfel, the trial court went so far as to include the very medical authorization it directed him to sign. [*Id.*] Nevertheless, Cronfel chose to ignore the trial court's explicit order – making unilateral handwritten changes to the authorization provided by the trial court (*i.e.,* limiting the medical records to be released to Murray). [*Id.* at 190.]

On October 7, 2014, Murray filed a motion for death penalty sanctions (with exhibits). [CR 176-354.] Included with this motion was Murray's original motion to compel (with its exhibits) [*Id.* at 217-46], his amended motion to compel (with exhibits) [*Id.* at 248-325], and his third motion to compel (with exhibits) [*Id.* at 340-54]. Murray also filed a supplemental motion for death penalty sanctions. [*Id.* at 355-65.]

After conducting a hearing, the trial court entered an order imposing a $5,000.00 sanction against Cronfel:

> IT IS ORDERED that the portion of [Murray's] motion seeking death penalty sanctions is denied at this time, and the Court will instead award lesser monetary sanctions, in part to cover the attorney's fees that [Murray] incurred in response to this motion and all prior underlying hearings on prior motions to compel, and in part *as sanctions for*

9

*objectionable conduct*, including but not limited to [*Cronfel's*] *altering the authorization form attached to the Order of the Court*, signed and filed on September 18, 2014;

[CR 413] (emphasis added).

3.    The Trial & Jury Verdict

The case was called to trial on November 17, 2014.  [I RR 1.]  After a three-day trial, the jury returned a verdict assessing Cronfel with 45% of the fault in causing his related injuries and placing 55% of the responsibility on Murray.  [CR 498-99; V RR 53.]  The Charge of the Court, which also reflects the jury's verdict, included the following instructions and definitions, provides as follows:

**INSTRUCTIONS AND DEFINITIONS**

"Negligence" means failure to use ordinary care, that is, failing to do that which a person of ordinary prudence would have done under the same or similar circumstances or doing that which a person of ordinary prudence would not have done under the same or similar circumstances.

"Ordinary care" means that degree of care that would be used by a person of ordinary prudence under the same or similar circumstances.

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and

10

without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Did the negligence, if any, of those named below proximately cause the injury in question?

## QUESTION 1

Answer "Yes" or "No" for each of the following:

1.  Patrick Murray                              <u>YES</u>

2.  Guillermo Ochoa-Cronfel         <u>YES</u>

If you have answered "Yes" to Question 1 for more than one of those named below, then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found caused or contributed to cause the injury. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measured by the number of acts or omissions found. The percentage attributable to any one need not be the same percentage attributed to that one in answering another question.

# QUESTION 2

For each of those named below that you found caused or contributed to cause the injury, find the percentage of responsibility attributable to each:

1. Patrick Murray          <u>55%</u>

2. Guillermo Ochoa-Cronfel    <u>45%</u>

    Total                <u>100%</u>

[CR 497-99.]

Additionally, the jury determined the following sums of money would reasonably and fairly compensate Cronfel for his injuries:

1. Physical pain and mental anguish sustained in the past.

   Answer: $2,500.00

2. Physical pain and mental anguish that, in reasonable probability, [Cronfel] will sustain in the future.

   Answer: $1,000.00

3. Physical impairment sustained

   Answer: $500.00

4. Physical impairment that, in reasonable probability, [Cronfel] will sustain in the future.

Answer: $2,000.00

5.    Medical care expenses incurred in the past.

Answer: $9345.00

6.    Medical care expenses that, in reasonable probability, [Cronfel] will incur in the future.

Answer: $3,000.00

7.    Disfigurement sustained in the past.

Answer: $ 0

8.    Disfigurement that, in reasonable probability, [Cronfel] will sustain the future.

Answer: $ 0

[*Id.* at 500-01.]

4.    <u>Cronfel's Expert Testified as to His Previous and Subsequent Wrist Injuries, as Well as History of Sporadic Treatment</u>.

At the outset of Dr. Lown's[2] cross-examination, the jury heard testimony that Cronfel had injured the same wrist, in the same manner, in a bicycle accident *four years earlier*. [IV RR 89-95.] Further, the jury learned Lown had not treated Cronfel until August of 2011, *more than two years after the accident*. [*Id.*] Indeed, the jury was also told Cronfel never sought to

---

[2] Dr. Lown was Cronfel's retained expert witness.

13

have his previously injured writ surgically repaired.

Q:     And just so we're clear, you'll recall you were asked questions that -- and I'm paraphrasing. But the idea was that it's – it's better to lay hands on a patient, to actually examine them to offer a more thorough opinion?

A.     That's correct.

Q.     And that was kind of the nature of those questions.  And you agree you never met [Cronfel] until August of 2011, correct?

A.     That's correct.

Q.     That's more than two years after the accident that forms the basis of this lawsuit, correct?

A.     That's correct.

Q.     And it's another three-and-a-half years before this event of 2005, correct?

A.     Yes.

Q.     And so whatever occurred right at the time of November of 2005, you did not lay hands on [Cronfel] and examine him in any way, correct?

A.     That's correct.

Q.     You don't -- you didn't examine him, visit with him, take a history from him, review his actual films in connection with that 2005 event, correct?

A. That's correct.

Q. All right. And, likewise, within the two years following the 2009 event, you did not lay hands on [Cronfel], examine him, review his films, for two years later?

A. That's correct.

Q. Now -- but you agree we -- we talked about this in your deposition. [Cronfel] did, in fact, have an almost identical, certainly a very similar, bike wreck in November of 2005. You understand that's true?

A. Yes

                    *           *           *

Q. And you understand that [Cronfel] saw Dr. Walters following that fall, correct?

A. That's correct.

Q. And Dr. Walters, he was a well-reputed hand surgeon in the local community before his untimely death, correct?

A. Yes, he was.

Q. He was a respected surgeon?

A. Yes.

Q. And you understood that Dr. Walters, following this fall and the history that

15

[Cronfel] gave, had [Cronfel] undergo a CT scan of his wrist, did he not?

A. That's correct.

Q. And that CT scan, which I finally have been able to bring up on the screen -- well, let's just go through it together and we can -- well, here we go, maybe. . . . . You talked about this a little bit with Mr. Cagle. That *CT scan* in November, it was *taken November 16th of 2005*, showed this widening, mild, but albeit widening, at the scapholunate articulation, correct?

A. That's correct.

Q. *And that is the same widening that you* had discussed that eventually -- or you had *offered the opinion will lead to surgery in 2014-2015*, correct?

A. **That's correct**.

Q. And Dr. Walters, or this -- this CT scan also referenced a concern with a ligamentous -- is that how you say that?

A. That's correct.

Q. Ligamentous injury, meaning an injury to the ligament, but it doesn't show up – that's the kind of thing that doesn't show up on a CT scan, right?

A. That's correct.

Q. So he referred [Cronfel] for an MRI, true?

A. That's true.

Q. So [Cronfel] -- and, of course, you have not had the benefit of the actual review of that CT scan of November 16th, true?

A. That's true.

Q. You haven't seen the film?

A. I've seen the reports.

Q. And, likewise, you haven't seen the MRI that was taken on December the 20th. Here it is. December 20th, the MRI that Dr. Walters wanted [Cronfel] to undergo, he did, in fact, have that MRI of his right wrist, correct?

A. That's correct.

Q. And that MRI revealed this disruption, which is another word for tear, correct?

A. That's correct.

Q. *The MRI taken three-and-a-half years before the fall in July '09 showed that [Cronfel] already had a tear at this scapholunate ligament*, true?

A. **<u>That's correct, yes</u>**.

Q. It doesn't say mild and it doesn't say the location. It simply says disruption, correct?

17

A.      That's correct.

Q.      *And, again, this particular tear is the topic or the subject that's going to lead to this four-corner fusion that you want to perform*?

A.      **That's correct**.

Q.      *And this tear is evidenced as far back as 2005, December of that year, correct*?

A.      **Yes**.

Q.      2005 [Cronfel] already has a tear in this part of his wrist, as evidenced by this MRI, correct?

A.      That's correct.

                *          *          *

Q.      And now that I finally got this working, just so that we're clear, the initial record shows that [Cronfel] fell off bicycle. Tried to break fall with right hand. Pain along pinky down to the wrist. Limits use. Do you see that?

A.      I do.

Q.      And that's what led to the CT scan and the MRI, which revealed the tear in his wrist, true?

A.      True.

Q.      And the tear that was evidenced in 2005 and the tear that was evidenced following 2009, as we sit here today in the end of 2014, five years

after this fall and nine years after the other fall, this tear still has not been addressed by [Cronfel], true, in a surgical way?

A.   In a surgical way; that's correct.

[IV RR 89-95 (emphasis added).]

In contrast to Cronfel's testimony as to his purported physical pain and inability to perform routine activities, his medical records and the Dr. Lown's testimony painted a much different picture.

Q.   And within three months of treating with Dr. Windler, [Cronfel] appears there on October 21st of 2009, and it says he's got pain with activities of lifting and push-ups. Do you see that?

A.   I do.

Q.   So within three months of the fall in Travis Country that [Cronfel] had, he has resumed his push-ups and weight lifting, true, with pain?

A.   True.

Q.   And at that time, within three months of this accident, he has full motion of the wrist and no tenderness over the distal radial or ulnar joint at that time, true according to Dr. Windler's records?

A.   That's true. . . .

Q.     But full range of motion, in any event, and no tenderness in those areas?

A.     Yes.

Q.     True.

A.     Yes.

Q.     And he appears a year later in 2010, now almost a year removed from this event in Travis Country. And at that time, he's still having pain, but he's reporting that he's still doing his bench press, his pull-ups, and his push-ups, is he not?

A.     He is.

Q.     So, again, a year after this accident, [Cronfel] is still engaging in his weight lifting activities despite whatever's going on in his wrist, true?

A.     That's correct.

Q.     And then the June -- he gets a -- an X-ray on July 21st, 2010. And just so there's no question, at that time, a year after this accident, there's no change in the wrist X-ray compared to the prior wrist X-ray, the date after this accident, true?

A.     That's correct.

Q.     So within a year of this accident, his wrist is unchanged, true?

A.     True.

Q.   And then [Cronfel] begins to treat with [Lown] on August 11, 2011 and continues to treat with [Lown] . . . to date. But, in particular, he treats with you on February the 2nd of 2012, does he not?

A.   He does.

Q.   And at that time, again, he is very physically active with a constant exercise regimen, true?

A.   That's true.

            *            *            *

Q.   And at that time [Cronfel], I guess the -- it seems to me, my interpretation is the therapist is getting onto him that he's not icing, but he -- but he hurts after his exercise, this joint -- this joint pain hand hurts after exercise, and he's not icing it.

A.   That's correct.

Q.   That's what's reflected in this record?

A.   Uh-huh.

Q.   And the therapist tells him he needs to stretch, pre-strengthening at the gym, and he needs to use ice post-exercise and he's not doing it.

A.   That's correct.

21

Q. Is that what's reflected in this record? And then he returns to either you or your physical therapist in March of 2012, and, again, he's complaining that during a workout he torqued his right wrist forcing his shoulder into hyperextension, and I don't know if ER means emergency room or not. But in any event, he torqued his right wrist while lifting, sometime immediately before Feb- -- pardon me, March 20th of 2012, true?

A. True.

Q. And, you know, with weight lifting, I mean, that's certainly something that's foreseeable. You can torque your wrist while lifting weights?

A. True.

Q. You can torque your wrist while lifting kettle bells, in particular, true?

A. True.

Q. And that's what appears to have happened with [Cronfel] in March two years ago, true, according to this record, he torqued his right wrist?

A. Yes.

[IV RR 95-99.]

22

By November of 2012 – approximately three years after the accident – the medical records (and testimony expert testimony) presented to the jury showed that Cronfel was physically able to go deer hunting, including loading all of his supplies and that he continued his rigorous physical fitness workout regimen.  [CR 100.]  In fact, Cronfel injured himself while working out with kettle weight-bells and heavy weights (against the specific advice of his physical therapist and Lown).  [IV RR 95-99.]

In March of 2013, Cronfel returned to see Dr. Lown, complaining of pain in his right hand – yet, the records reveal Cronfel's complaints in his right hand or wrist were the result of a *separate and distinct bicycle accident*, which occurred in August of 2012 – *i.e.*, over three years after the accident at issue.

> Q.   Now, [Cronfel], again, returns to your office on March 5th of 2013, this past year, and he's talking about his right hand still hurts, but the left is better.  Do you see that?
>
> A.   I do.
>
> Q.   And then he returns again two weeks later, and he's still complaining of this right hand pain.  But here's what is interesting here: On your medical record, on March 29th, 2013, it contains a reference to HPI.  ***And what does HPI stand for on your medical records?***

A.  **History of present illness**.

Q.  And so this was with respect to [Cronfel's] right wrist. His history of present illness is what?

A.  I'm sorry?

Q.  What's [Cronfel's] history of present illness?

A.  Bicycle riding August 5th, 2012.

Q.  Okay. And just so we're clear, according to your medical record from your office, [Cronfel] is complaining of right wrist pain, and the history provided for his right wrist pain last year, was a bicycle accident on August the 5th of -- bicycle riding on August the 5th of 2012, true?

A.  That's what it says.

Q.  And then he returns again on August – pardon me, May 28th, and he had an event at the Westlake – or it took him to the Westlake Hospital. He comes to your office, and he's talking about, he woke up on May 25th with swelling and pain in his right wrist. And, again, what is the history of his present illness?

A.  August 5th, 2012.

Q.  So, again, [Cronfel] woke up and, in fact -- let me just show you the record. He goes to Westlake Hospital emergency room complaining of right wrist pain, and it's

24

talking about, had soft tissue mobilization. I can't make out a lot of this. But having painful swelling at right wrist, which – so painful that it took him to the ER at Westlake, correct?

A. Correct.

Q. And he follows up with your office again the next day, after having to go to the emergency room and the history of present illness. *What took him to the emergency room was whatever happened bicycle riding on August 5th of 2012, true?*

A. **That's what the record says**.

Q. And that's what three other records before that say, do they not?

A. They do.

Q. As do subsequent records where he's, again, complaining of right wrist pain, and your therapist reports, Patient doesn't wear his splint very often because it gets in the way. Do you see that?

A. I do.

Q. And so he's there treating, still for his right wrist with a history of present illness of August the 5th of 2012, true?

A. True.

Q. And not to beat a dead horse, but this occurs again on -- on December 31st, he's at your office complaining, same history. He's there again in March of this year, same history. He's there in July of this year, same history. He's there in August, same history. And then you perform the surgery to the right wrist, this one you've described to this jury. And what does the narrative say? This is -- this is a couple of months ago, September 11th, 2014. At that time, this is the -- this is the history that you give in the narrative, correct?

A. Correct.

Q. What does it say? This is a 56-year-old male **who is riding his bike and was hit by a car on August the 5th of 2012** and sustained a radial head fracture with some slight shortening after this heal. The report that you submitted, or the narrative report that you created in connection with your surgery done a couple of months ago, references a whole new third accident involving a car in 2012, does it not?

[IV RR 101-04.]

Incredibly, Dr. Lown blithely suggested the dozen or more references to Cronfel's August 2012 collision with an automobile was a mistake or the fault of his medical assistant. [*Id.* at 105.] Further undermining Cronfel's efforts to relate his recent complaints to the incident involving Murray's dog in July of 2009 were the medical records Cronfel placed in evidence

26

demonstrated that by October of 2009, his right wrist had full range of motion and was found, upon examination, to be "normal."

Q. And then he saw Dr. Windler, who saw him twice in August, once in September, and once in October of '09. You're familiar with those records, correct?

A. Correct.

Q. And we already talked about the October '09. At the end of October, he's got full range of motion in his wrist, true?

A. Correct.

Q. And essentially, at that time he had a normal exam, did he not?

A. I believe so.

Q. So -- just so we're clear, on August 21st of 2009, Dr. -- according to Dr. Windler's records, [Cronfel's] wrist exam was normal.

A. I believe so.

Q. And it was not as best I recall, he was not treated again for the right wrist until June of 2010, some eight months later, where he had an injection in his wrist, correct?

A. Okay.

Q. Do you have any reason to disagree with that?

A.    No.

[IV RR 107.]

The jury also heard testimony that after Cronfel's doctor advised him that his wrist was normal and that he had full range of motion, he did not seek further treatment for some eight months later, then went another nine months until seeking treatment, and then still another five months until going to see Dr. Lown for the first time (which is also just about the time suit was filed).  [IV RR 108.]

The inconsistencies Murray highlighted to the jury as to Cronfel's assertion the 2009 accident was the sole cause of his wrist injury included:

➢    **Prior Injury**: the evidence showed Cronfel had sustained a virtually identical injury to the same wrist in 2005 [Record cited needed];

➢    **No Surgery**: the evidence showed Cronfel never sought surgery to repair the previously 2005 injury to his right wrist [Record cited needed];

➢    **Subsequent Injury**: the evidence showed Cronfel had collided with an automobile while riding his bike, which injured the same wrist [Record cited needed];

➢    **Full Range of Motion and the Wrist Medically Declared Normal in August 2009**: the evidence showed Cronfel had regained

28

full range of motion and his wrist was declared "normal" by Dr. Windler approximately one month after the accident [Record cited needed];

➢ **Sporadic and Inconsistent History of Treatment**: the evidence showed Cronfel sought sporadic, at best, medical on his wrist, yet maintained an active lifestyle and strenuous exercise regimen, and missed no time from work [Record cited needed].

5.    Cronfel's Testimony Lacked Credibility.

Subsequent to the Dr. Lown's testimony, Cronfel testified that, contrary to what his medical records said, he never sustained a right wrist injury in 2005.

> Q.    And, of course, you remember giving your deposition long about a year ago, October of – of 2013, right?
>
> A.    Yes, sir.
>
> Q.    And you agree that in your sworn deposition, you told me back then that you had never injured your right wrist before the July 2009 event, correct?
>
> A.    I think that later in that deposition I had sort of cleaned that up a little bit.
>
> Q.    But at least when I asked you the specific question, prior to the event that we are here for today, had you previously sustained an

injury to your right wrist, do you remember what your response was?

A.   What you just said, sir.

Q.   Never, correct?

A.   Yes, sir.

Q.   And you recall that I asked you, prior to the event that we are here for today involving Mr. Murray's dog, have you ever seen a healthcare provider for the purpose of treating right elbow pain or right wrist pain, and you answered that I remember, no, correct?

A.   Correct.

                *         *         *

Q.   And you didn't -- when I took your deposition, you didn't remember having any therapy in 2005, and we know that not to be true as well, correct?

A.   That's true.

                *         *         *

Q.   And you do agree that you did, in fact, have a ligament injury in 2005, correct?

A.   That's what the medical records say, yes, sir.

Q.   And you did have treatment to your right wrist in 2005 with Dr. Walters, correct?

> A. I don't remember whether I had treatment with him in 2005 for my wrist.

[IV RR 174-77.]

Significantly, Cronfel also testified that he injured his right hand and wrist in a **_2007_** bicycle accident:

> Q. And, you just testified you had another bicycle accident in 2007 where you went over the handlebars and you hurt your right hand, correct?
>
> A. Yes, sir.
>
> Q. And very similarly -- and as a result of that injury, you also had some difficulty typing, difficulty gripping, difficulty writing, correct?
>
> A. If that's what it says, it's true.

[*Id.* at 177-78.]

Additionally, Cronfel's cross-examination yielded the following telling testimony:

> Q. Now, this accident occurred, you've talked about this, it was on July the 23rd of 2009 around 6:00 to 7:00 p.m., correct?
>
> A. Somewhere in there, yes, sir.
>
> Q. And you're on a street that you're familiar with and that you rode often, correct?

A.    Yes, sir.  That's correct.

Q.    And prior -- this was -- you talked about this earlier.  This was your neighborhood.  You rode it.  You had two or three routes in the neighborhood you rode hundreds of times, correct?

A.    That's correct, sir.

                    *            *             *

Q.    You agree that -- that wherever the contact, if any, was, it was at your front wheel, not against you and not at your back wheel?

A.    Right.  It was the front wheel, yes, you're right, sir.

Q.    And, of course, you were on a road bike?

A.    Yes, sir.

Q.    And the road bikes are such you actually have to clip into your pedals where your shoes are attached to your pedals, right?

A.    Correct, sir.

Q.    And at the time of the accident, you were coming up on parked cars, right?

A.    Correct, sir.

Q.    *And you agree you were going pretty fast?*

A.   **I was trying to pick up speed**, yes, sir.

Q.   And I think the term you might have used before is, *you were revving up*, correct?

A.   **Yes**, sir.  That's correct.

Q.   *You were going pretty fast and revving up beside the parked cars, correct?*

A.   **That is true**.

Q.   And you agree that the rules of the road apply to bicyclists just like they do to automobile drivers, correct?

A.   I would think so.

Q.   The rules of the road apply to bicyclists, true?

A.   I think so, yeah.

Q.   And *a bicyclist*, like anybody operating a motor vehicle on a public street, you've *got a duty to keep a proper lookout, right?*

A.   **Right**.

Q.   *You've got to look at your surroundings, right?*

A.   **Right**.

Q.   Well, in fact, *on a bicycle*, you're even more vulnerable, and so *you've got to have this heightened sense of everything that's going on*

33

*around you, true?*

A. **True**.

Q. And I can't bring that picture back up, but you would agree, this roadway is pretty open, fairly flat, correct?

A. It's kind of an uphill.

Q. A gradual uphill?

A. Yes, sir.

Q. And *other than cars parked along the street, there's nothing there to block your view, no curves, no big hump in the road, anything like that, correct?*

A. **Yes, sir**.

Q. It's your testimony and contention, *you never saw Mr. Murray or his dog* at any moment before the dog came out in -- in front of you or into your path?

A. **Yes**, sir.

Q. And as *you were going pretty fast and starting to rev up, you never noticed Mr. Murray over in the yard, correct?*

A. **Yes**, sir. **That's correct**.

Q. And we've already talked about this, but the collision, if any, occurred between your front wheel and the animal?

A.    Yes, sir.

              *           *           *

Q.    Do you know the distance separating you and Magnum, the dog, as you noticed that something may occur?

A.    He was on top of me when I noticed.  It was already -- he was already on top of me practically.

Q.    Now, when you say on top of you, you don't literally mean on you?

A.    No.  He came out from behind a car, or, you know, he was coming out from behind a car. When I noticed him, he was already almost making contact with the bike.  It was a very short distance.

Q.    I thought I understood earlier, you felt like you were far enough out in the roadway that you were not concerned about a swinging door of a parked car?

A.    Yes, sir.

Q.    So what distance is that?  What distance made you feel safe far enough away from those parked cars?

A.    You know, three, four feet - something like that.

Q.    So in any event, the dog, Magnum, would have had to have come out three or four feet

35

in order to get up to your path, fair?

A.    I guess so.

Q.    So the dog would have had to move three or four feet within your point of view before any contact could have been made?

A.    No. Because that's assuming that I'm seeing him come in front of me. He came -- as I was passing that car and came from the side this way.

Q.    I thought we agreed it was between your front wheel and the dog, if at all, the contact? I mean, it's not as if he's coming into you. He's coming into your front wheel?

A.    He came into my front wheel from the side, sir.

Q.    As you're going pretty fast and revving up, the dog has an opportunity to travel four feet into the side of your wheel, three feet out from a parked car as you traveled up this roadway?

A.    You know, you can come up with numbers. All I can tell you is that he came into my bike from the side, and I had no chance to react or avoid him.

Q.    And you agree you did not react; you did not shift to the left or the right; brake; do anything to avoid the accident?

A.    I had no chance.

Q.     And you did not do so, true?

A.     True.

[IV RR 178-85.]

Later in the trial, the jury heard Murray's testimony as to where Cronfel was immediately after the claimed collision with Magnum, the dog:

Q.     And when you went out there, you heard the commotion behind you, you turned, you go to see what has occurred. Where did you find [Cronfel]?

A.     In the middle of the street.

Q.     Was he up against that white car?

A.     No, no. He was three, four feet, at least, to the left of it. He wasn't even with the car. He was a little forward of the car.

Q.     He was forward of the car and out in the middle of the street?

A.     Correct.

Q.     And that's where -- based on what you saw immediately thereafter, that's where he came to rest?

A.     That's correct.

Q.     In the middle of the street?

A.    Correct.

[IV RR 223-24.]

Thus, the jury heard testimony from Cronfel that he had a duty to keep a lookout, was riding very fast in the middle of the road, never saw Magnum, and did nothing to avoid colliding with the dog.

## SUMMARY OF THE ARGUMENT

The jury concluded Murry was 55% responsible for Cronfel's injuries as a result of his bike-dog collision and Cronfel bore 45% of the responsibility. The jury also concluded $18,345.00 would fairly compensate Cronfel for the injuries proximately caused by this collision. Given Cronfel's high-speed cycling on a residential street at the time of the collision and Cronfel's history of injuries before and after the incident, the jury's verdict was clearly supported by the evidence. Of course, the jury was the *sole* judge of the credibility of the witnesses – *e.g.*, Cronfel and Dr. Lown – and the weight, if any, to be given to their testimony. Indeed, Cronfel's appeal as to the sufficiency of the evidence supporting the jury's verdict boarders on the frivolous.

As for the trial court's $5,000.00 sanction for Cronfel's willful and conscious disregard of its discovery order, the record fully supports such a sanction, that it was imposed to secure compliance with discovery rules and to enforce the orders entered by the trial court, and therefore, does not represent an abuse of discretion.

## ARGUMENTS AND AUTHORITIES

A.    The Standard of Review

   *1.    Legal Sufficiency*

It is well established that a reviewing court will sustain a legal sufficiency point if the record reveals: (a) the complete absence of a vital fact; (b) the law precludes giving any weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005) (citing Robert W. Calvert, "NO EVIDENCE" & "INSUFFICIENT EVIDENCE" POINTS OF ERROR, 38 Tex. L. Rev. 361, 362-63 (1960)). Ultimately, a legal sufficiency assessment determines whether the evidence at trial would enable reasonable people to reach the verdict under review. *Id.* at 827.

When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is less than a scintilla and, in legal effect, is no evidence. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citing *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)). But more than a scintilla of evidence exists if the evidence rises to a level that would enable reasonable and fair-minded

people to differ in their conclusions. *Ridgway*, 135 S.W.3d at 601 (citing *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)). As this Court is well aware, the reviewing court reviews the evidence in the light most favorable to the verdict, crediting favorable evidence, and disregarding contrary evidence. *Wilson*, 168 S.W.3d at 807.

Moreover, as this Court acknowledged in *McDonald v. Dankworth*, 212 S.W.3d 336, 339 (Tex. App.–Austin 2006, no pet.), jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. When there is conflicting evidence, it is the province of the jury to resolve such conflicts. *Wilson,* 168 S.W.3d at 820. If conflicting inferences can be drawn from the evidence, Texas courts assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences. *Id.* at 821. But if the evidence allows only one inference, the court may not disregard it. *Id.* As long as the evidence falls within a zone of reasonable disagreement, the reviewing court cannot substitute its judgment for that of the trier-of-fact. *Id.* at 822.

Because Cronfel is attacking the legal sufficiency of an adverse finding on the issue of his negligence, he must demonstrate that there is ***no evidence*** to support the adverse finding. *Croucher v. Croucher*, 660 S.W.2d

41

55, 58 (Tex. 1983); *Ins. Network of Tex. v. Kloesel*, 266 S.W.3d 456, 469-70 (Tex. App.--Corpus Christi 2008, pet. denied). In determining this no-evidence issue, the Court views all of the evidence in the light most favorable to the jury's finding of contributory negligence, consider only the evidence and inferences which tend to support the jury's finding of contributory negligence, and disregard all evidence and inferences to the contrary. *Bradford v. Vento*, 48 S.W.3d 749, 754 (Tex. 2001); *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997); *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995); *Hooper v. Smallwood*, 270 S.W.3d 234 (Tex. App.--Texarkana 2008, pet. denied).

2.  *Factual Sufficiency – Against the Great Weight and Preponderance of the Evidence*

When a party attacks the factual sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex. 1983). The reviewing court must consider and weigh all of the evidence, and can set aside a verdict only if the evidence is so weak or if the finding is so against

42

the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). In doing so, the court of appeals must "detail the evidence relevant to the issue" and "state in what regard the contrary evidence greatly outweighs the evidence in support of the verdict." *Id.* at 635.

When reviewing a challenge to the factual sufficiency of the evidence, the court of appeals considers all of the evidence introduced at trial. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). The appellate court, in reviewing a factually insufficient evidence challenge, must examine the entire record to determine if there is some probative evidence to support the jury's verdict and, if there is, determine whether the evidence supporting the finding is so weak or the jury's answer so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965).

"Factual sufficiency [issues] concedes conflicting evidence on an issue, yet maintain that the evidence against the jury's finding is so great as to make the finding [clearly] erroneous." *Raw Hide Oil & Gas, Inc. v. Maxus Expl. Co.*, 766 S.W.2d 264, 275 (Tex. App. 1988, writ denied). For Cronfel to succeed on his factual sufficiency challenge, the Court must determine

from a review of the entire record whether the jury's findings are manifestly unjust and against the great weight and preponderance of the evidence. *Traylor v. Goulding*, 497 S.W.2d 944, 945 (Tex. 1973).

3.    *A Court May Not Substitute Its Judgment for that of the Jury's*

Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003); *City of Keller*, 168 S.W.2d at 819. The jury may choose to believe one witness and disbelieve another. *Silcott v. Oglesby*, 721 S.W.2d 290, 293 (Tex. 1986) (jurors alone "resolve conflicts and inconsistencies in the testimony of any one witness as well as in the testimony of different witnesses"); *City of Keller v. Wilson*, 168 S.W.3d 802, 819 (Tex. 2005). In deferring to the jury's judgment, an appellate court must assume the jury decided all credibility questions in favor of the verdict and disbelieved testimony contrary to their decision. *Id.*

Further, in every circumstance in which reasonable jurors could resolve conflicting evidence either way, the reviewing court must presume the jury did so in favor of its verdict, and disregarded all conflicting evidence, as it is the province of the jury to resolve conflicts in the evidence. *Dresser Indus., Inc. v. Lee*, 880 S.W.2d 750, 754 (Tex. 1993).

Furthermore, the court of appeals cannot summarily disregard evidence or to substitute its judgment for the jury's. *Clancy v. Zale Corp.*, 705 S.W.2d 820, 826 (Tex. App.–Dallas 1986, writ ref'd n.r.e.). A reviewing court does not act as a fact finder, and may not pass upon the credibility of witnesses or substitute its judgment for that of the trier-of-fact, even if the evidence would support a different result. *Id.* Instead, the court of appeals is called on to apply a legal analysis to the evidence and avoid summary conclusions.

As part of the appellate court's review of a factual sufficiency challenge, appellate courts are to be mindful of the fact the jury was not convinced to find in favor of the complaining party by a preponderance of the evidence at trial. *Herbert v. Herbert*, 754 S.W.2d 141, 144 (Tex. 1988). Moreover, the reviewing court may not reverse simply because it concludes that "the evidence preponderates toward" an answer different than the one rendered by the jury. *Id.;* and *see, M.D. Anderson Hosp. & Tumor Inst. v. Felter*, 837 S.W.2d 245,247 (Tex. App.–Houston [1st Dist.] 1992, no writ).

A jury finding may be based on inferences fairly drawn from the evidence. *Briones v. Levine's Dep't Store, Inc.*, 446 S.W.2d 7, 10 (Tex. 1969).

In making its finding, the jury is privileged to believe all, part or none of the witnesses' testimony and draw reasonable inferences from facts proved. *Kentucky Cent. Life Ins. Co. v. Fannin*, 575 S.W.2d 76, 80 (Tex. Civ. App.–Amarillo 1978, no writ). The jury, as the fact finder, had the opportunity to view the witnesses and was the sole judge of their credibility and the weight to give to their testimony. *Eberle v. Adams*, 73 S.W.3d 322, 327 (Tex. App.–Houston [1st Dist.] 2001, pet. denied).

In the end, the seminal inquiry for the reviewing court is after considering all the evidence, was the jury's finding so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

B.    The Jury's Negligence Finding as to Cronfel Is Supported By Legally and Factually Sufficient Evidence

On similar facts, this Court upheld a remarkably similar verdict in *McDonald v. Dankworth*, 212 S.W.3d 336 (Tex. App.–Austin 2006, no pet.). There, Diana Dankworth ("Dankworth") rear-ended David McDonald ("McDonald"). As this Court explained:

> Shortly before 1:00 p.m. on Saturday, February 9, 2002, the three were in a line of northbound traffic on U.S. Highway 183 in Cedar Park. [Michael] Mazza ("Mazza"), driving a minivan, was in front

of McDonald, who was driving a 2002 Chevrolet Silverado pickup. Dankworth, then sixteen, was behind McDonald, driving a Plymouth Sundance. The three vehicles were in the far-left northbound lane of an undivided portion of 183. The pavement was dry and visibility was clear.

Initially, the line of vehicles was stopped at a red light at the intersection of 183 and Cypress Creek. There was a considerable amount of traffic, and it was estimated that there were as many as thirty other cars, or 400 feet, between Mazza's car and the intersection. Mazza and Dankworth testified that the light turned green, and all three witnesses agree that traffic began to move, then stopped again, at which time Dankworth rear-ended McDonald.

*McDonald*, 212 S.W.3d at 340-41.

Dankworth conceded her negligence contributed to the collision, but contended McDonald was also responsible because he made an "unexpected" or "sudden" stop in front of her. The jury found both Dankworth's and McDonald's negligence proximately caused the occurrence, allocated 50% of the responsibility to each, and found that McDonald was entitled to recover $4,549.57 in past medical expenses, $1,497.54 in lost wages, and nothing for physical impairment, physical pain and mental anguish. The trial court rendered judgment on the verdict, awarding McDonald $3,023.55 (50% of the damages the jury had found).

47

Just as in this matter, McDonald contended on appeal that (1) there was legally or factually insufficient evidence to support the jury's findings that his negligence was a proximate cause of the collision; (2) the evidence conclusively established that McDonald incurred $31,348.87 in medical expenses as a result of the collision, or, alternatively, that the jury's award of only $4,549.57 in past medical expenses is against the great weight and preponderance of the evidence; and (3) the jury's zero damage findings for physical pain and mental anguish and physical impairment were against the great weight and preponderance of the evidence.

After reviewing the testimony of Dankworth and McDonald, the court of appeals concluded that the evidence did not conclusively establish that Dankworth's negligence was the sole proximate cause of the collision. *Id.* at 344. This Court considered other evidence (separate from that describing the manner in which the collision occurred), focusing on the events leading up to the collision and determined it was sufficient to present the issue of whether McDonald's negligence caused or contributed to the accident. In upholding the jury's verdict, this Court noted:

> McDonald and Mazza testified that Mazza did not stop suddenly or unsafely, but made what McDonald termed a "normal stop." The jury could

48

have credited this testimony, and doing so would have made more probable than not that either: (1) McDonald stopped more suddenly and abruptly than was necessary to avoid hitting Mazza, *cf. Rash v. Whisennand*, 453 S.W.2d 353, 358-59 (Tex. Civ. App.—Houston [14th Dist.] 1970, writ ref'd n.r.e.) (finding fact issue regarding negligence where there was evidence that lead driver slammed on brakes one and one-half car lengths behind the next car in front); or (2) McDonald's sudden stop was made necessary by his negligence in following too closely behind Mazza. *Cf. Oakley v. C.E. Duke's Wrecker Service,* 557 S.W.2d 810, 813 (Tex. Civ. App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.) (evidence that lead driver had negligently created situation that required her to make sudden stop).

*McDonald*, 212 S.W.3d at 344-45.

Much like in *McDonald*, the jury here heard testimony from which it could have found Cronfel was negligent (*i.e.*, comparatively at fault) in that the evidence was undisputed that Cronfel was traveling at a high rate of speed adjacent to and in close proximity to cars parked on the side of the road [IV RR 179-80], that although Cronfel admitted he had a duty to keep a proper lookout and, as a bicyclist, to have a heightened awareness of his surroundings, he never saw Magnum [*Id.* at 180-84], that Magnum collided with the side of his front wheel, and that he did not take any evasive action to avoid the collision [*Id.* at 185]. Moreover, the jury heard testimony that

Cronfel was going so fast that he did not see or have time to react despite the fact Magnum had to travel in excess of four feet from the parked cars before he could have possibly made contact with the side of Cronfel's front wheel. [*Id.* at 183-84.]

The jury likewise heard testimony from Murray that Cronfel was in the middle of the road and past the parked cars when the collision with Magnum took place [*Id.* at 223-24] – yet, Cronfel (1) admitted he never saw Magnum and (2) did not even attempt to avoid the collision [*Id.* at 183-85]. Much like in *McDonald*, the evidence presented to the jury supported the conclusion that Cronfel failed to keep a proper lookout (a duty he admitted to having), and that Cronfel was traveling too fast under the circumstances, or that due to his speed and failure to keep a proper lookout, Cronfel failed to take any evasive action or attempt to avoid the collision. All of which, either taken together or separately, is legally sufficient evidence to support the jury's finding of negligence on Cronfel's part.

Just as Cronfel's legal sufficiency challenge fails, his factual sufficiency challenge also fails. The jury was presented with evidence which called Cronfel's credibility into question and from which the jury could have found him untrustworthy. [*See* IV RR 174-77.] Further, the jury

50

heard testimony from Cronfel himself that he was going at such a breakneck speed that, despite admitting a duty to do so, failed to see Magnum, and because of his high rate of speed failed to take any evasive action to avoid colliding with Magnum. [*Id.* at 180-185.]

The jury was also shown a picture of the where the collision took place from which it could have surmised Cronfel was negligent in failing to keep a proper lookout or was traveling too fast under the circumstances, either of which or both, were causes or contributing factors to the accident. In this regard, the picture plainly demonstrated that Magnum would have had to travel more than twenty feet before reaching the roadway – and then another four feet to collide with Cronfel – during which Cronfel never saw the dog (*i.e.*, failed to keep a proper lookout). It is also true that the jury might have noted Cronfel would be high enough up so that he should have seen the dog or noticed it in his peripheral vision and taken evasive action to avoid the collision. [VII RR 7.]

Based on the evidence presented, the jury was justified in finding that Cronfel's conduct constituted negligence. Regardless, the evidence is not so one-sided such that the jury's finding of comparative negligence was clearly wrong or manifestly unjust.

C.  The Evidence Is Factually Sufficient to Support the Jury's Damage Awards

Again, *McDonald* is instructive as to whether the evidence was legally

sufficient to support the damage amounts awarded Cronfel by the jury.  In

*McDonald* this Court held:

> [T]he amount of damages for physical pain and suffering, mental anguish, and physical impairment are inherently subjective and uniquely within the jury's province, *see Dawson v. Briggs*, 107 S.W.3d 739, 750-51 (Tex. App.--Fort Worth 2002, no pet.), no such amount can be conclusively established in the evidence as a matter of law, and therefore an appellate court cannot render judgment awarding such an amount.  *See Pilkington v. Kornell*, 822 S.W.2d 223, 225 fn. 1 (Tex. App.--Dallas 1991, writ denied).  We accordingly will construe McDonald's issues concerning the jury's zero damages awards for pain and suffering, mental anguish, and physical impairment as solely factual sufficiency challenges; *i.e.*, that the zero damages awards are against the great weight and preponderance of the evidence.

*McDonald*, 212 S.W.3d at 346 fn. 12.

Much like in *McDonald*, Murray vigorously disputed whether all of

Cronfel's medical treatment and expenses, purported physical pain and

suffering, mental anguish, and alleged impairment were caused by the

accident at issue.  With respect to the evidence submitted supporting the

52

jury's award of $9,345.00 in past medical expenses and $3,000.00 in future

medical expenses, Murray presented evidence that:

❖ Dr. Lown did not see or begin to treat Cronfel until approximately two years after the accident involving Magnum [IV RR 90];

❖ Lown admitted Cronfel injured the same wrist in 2005 in a bicycle accident [*Id.* at 91];

❖ The same injury complained of after the 2009 accident actually occurred because of the 2005 accident [*Id.* at 92];

❖ A MRI taken three-and-a-half years prior to the 2009 accident showed that Cronfel had a tear in the same ligament in the same wrist because of the 2005 accident [*Id.* at 93];

❖ Cronfel never had surgery to repair the ligament tear dating back to 2005 [*Id.* at 95];

❖ Within one-month after the 2009 accident, Cronfel had full range of motion and his wrist was declared medically "normal" by Dr. Windler and that Cronfel did not seek any further treatment until ten months later, during which time Cronfel had resumed his regimen of lifting weights and other physical activities [*Id.* at 107];

❖ Within three months after the 2009 accident, Cronfel had full range of motion, no tenderness in the wrist, and had resumed his regimen of heavy weight lifting, including bench press, pull-ups, and push-ups [*Id.* at 95-

96];

❖ In the months after the accident, Cronfel was engaging in strenuous workouts to such a degree that his physical therapist advised him his routine was causing him joint pain in his hand and wrist [*Id.* at 97];

❖ Cronfel complained in 2012 that he injured his right wrist during a weight lifting session, *and* he was in another bicycle accident, going over the handlebars, in the same year [*Id.* at 98-99];

❖ Cronfel was engaging in physical activities in the latter part of 2012, such as water skiing, deer hunting, and his continued weight lifting routine – as to which his therapist again warned him he was overdoing it and was risking serious injury [*Id.* at 99-100];

❖ Cronfel was in another bicycle accident in August of 2012 in which he injured his right wrist to such a degree that he went to the emergency room for treatment and then to Dr. Lown  [*Id.* at 102-04];

❖ Cronfel had a history of sporadic and intermittent medical treatment [*Id.* at 107-09]; and

❖ Cronfel did not seek any further medical treatment for ten months after Dr. Windler examined him, at which time (in July of 2010) an x-ray showed his wrist was unchanged;

❖ Another nine months elapsed before Cronfel received an injection in March 2011;

❖ Another five months passed before Cronfel saw Dr. Lown in August 2011; and

❖ Between July 23, 2009 and August 2011 – a total of 749 days – Cronfel sought treatment for his wrist four to five times, all while maintaining an active lifestyle, a strenuous exercise regimen, and did not miss any time from work.

The evidence here parallels that in *McDonald*, on which this Court held the evidence was factually sufficient to support the jury's damage awards. That is, in *McDonald*, this Court noted that Dankworth presented evidence that McDonald's complained of injuries and pain which could have been caused by something which occurred prior to the rear-end collision, that McDonald had received medical treatment prior to the accident, but had not undertaken any surgical procedure to remedy his issue, and that Dankworth:

> also elicited evidence that McDonald had disregarded doctor's orders regarding his workload after the collision, that he had delayed seeking medical treatment, and that he wore a heavy motorcycle helmet on his job. Finally, Dankworth emphasized that McDonald had not complained of pain at the accident scene, that his x-rays were normal, and that his claimed injuries had caused relatively little interruption to his work schedule.

> A rational jury could infer from the evidence that the expenses associated with Dr. Fyfe and his suspicion of a carotid artery dissection did not result from the collision, but from the discovery of the retention cyst, a condition unrelated to the collision. A rational jury could further infer that McDonald's own actions caused or contributed to his symptoms.

*McDonald*, 212 S.W.3d 348-49.

Here, Murray presented evidence the complained of injury to Cronfel's right wrist existed prior to the 2009 accident, that Cronfel had not had surgery to correct the ligament tear, that Dr. Windler declared his wrist normal one-month after the accident, that Cronfel's x-rays three-months after the accident showed his wrist was normal, that Cronfel had not missed any work and was not seeking lost wages, that the purported wrist injury had not interrupted his workout routine or active lifestyle, and that his complaints of pain may have been caused by something other than the 2009 accident.

As in *McDonald*, the evidence in the matter *sub judice* fails to conclusively establish the amount of medical expenses Cronfel sought to recover was incurred solely because of the 2009 accident. Hence, the evidence is factually sufficient to support the amount of medical expenses

actually awarded by the jury.

Cronfel also complains on appeal the evidence is not factually sufficient to support the jury's award of damages as to his claims of physical pain and suffering, mental anguish, physical impairment, and disfigurement. However, just as in *McDonald*, the jury could have reasonably attributed his pain and suffering, mental anguish, impairment, and disfigurement, if any, to something other than the accident. Again, the jury was keenly aware of Cronfel's other bicycling accidents and workout routine, as possible explanations for any subjective complaints he had.

In *McGuffin v. Terrell*, 732 S.W.2d 425 (Tex. Civ. App.–Fort Worth 1987, no writ), the Fort Worth Court of Appeals found that injuries to the shoulder and neck of the plaintiff who claimed they resulted from an auto accident were subjective injuries and affirmed a zero damages award. Much like this matter, the *McGuffin* jury heard McGuffin's testimony as to the extent and severity of her purported injuries, and from the treating physician as to the cause of them. *Id.* at 426. McGuffin also provided medical reports from her treating physician and expense statements of various physicians who examined her, as well as the records from a physical therapist to whom she was referred for treatment. *Id.*

57

McGuffin did not complain of any injuries at the scene. *Id.* McGuffin's testimony was that she first started to experience pain in her neck and shoulder several hours after the accident. *Id.* The next day, McGuffin saw her family doctor. *Id.* After several follow up visits, McGuffin was referred to a physical therapist for treatment of her subjective injuries (*i.e.*, a sore neck and muscle pain). *Id.*

When her pain did not subside, McGuffin was referred to an orthopedic surgeon who found no objective symptoms which would cause the pain of which she complained. *Id.* Thereafter, a neurosurgeon ran an Electromyography test on McGuffin.[3] *Id.* McGuffin also underwent a computerized tomography test, commonly referred to as a CAT scan, which much like the EMG test, is a diagnostic test which (using x-rays) produces a cross-sectional image, which can be interpreted by a specialist. *Id.* None of these examinations revealed any objective symptoms of injury. *Id.* The jury found Terrell negligent in causing the accident, but only awarded McGuffin $50.00 in medical expenses and zero damages for all other damage claims. *Id.* at 426-27.

---

[3] Electromyography ("EMG") is a diagnostic procedure to assess the health of muscles and the nerve cells that control them (motor neurons). Motor neurons transmit electrical signals which cause the muscles to contract. An EMG translates these signals into graphs, sounds or numerical values which a specialist interprets. *See* MAYO CLINIC WEBSITE.

Just like Cronfel, McGuffin argued on appeal the zero-damage awards as to pain and suffering, mental anguish, and impairment were against the great weight and preponderance of the evidence. *Id.* at 427. The Fort Worth Court of Appeals disagreed, noting McGuffin's complaints were subjective, which the jury was free to disbelieve:

> [T]he opinions [relied on by McGuffin] recite that examination of the parties complaining of injury revealed objective symptoms such as fracture, laceration, bruise, hematoma or muscle spasm. In the present case, there were no findings of objective symptoms until approximately three weeks after the accident, when after several office visits, Dr. Murphy noted muscle spasm. All of the reports of other examining physicians indicated no objective symptoms were present. . . .
>
> The jury must have also believed that her injury did not require all of the examinations and treatment received by [McGuffin]. The jury was free to disbelieve, and apparently did disbelieve, Dr. Murphy's opinion that the treatment and medication received by [McGuffin] was necessary for the injury sustained. Un-contradicted testimony of expert witnesses must be taken as true insofar as it establishes facts, however, opinions as to deductions from those facts are not binding on the jury. Opinion testimony does not establish material facts as a matter of law. The jury was accorded the privilege of considering medical reports indicating no objective symptoms and were not compelled to accept Dr. Murphy's opinion deductions. The jury apparently did not believe [McGuffin's] testimony

as to the severity of her injuries nor her alleged pain and disability. The jury may disbelieve an interested witness even if un-contradicted. Substantially all of the evidence concerning [McGuffin's] pain and suffering and the extent of her alleged injuries came from [McGuffin] or from Dr. Murphy to whom she had related her alleged pain and suffering. The jury had the duty to consider this testimony, the reports of medical findings and diagnosis by others who examined [McGuffin]. The jury likewise could accept or reject any part or all of the evidence and reconcile any inconsistencies therein. Apparently, the jury determined that the findings of some of the examining physicians were inconsistent with [McGuffin's] complaints and the deduction opinion made by Dr. Murphy. The jury resolved these inconsistencies against [McGuffin]. The jury had a duty to fix an amount it believed was reasonable and necessary for the treatment of any injury received by [McGuffin] which it may have found resulted from the collision. Apparently the jury determined the extent of any injury [McGuffin] may have received from the collision was quite minimal and that only the sum of $ 50.00 was a reasonable and necessary amount for the examination and treatment of [McGuffin] for such injury. If the opinion of Dr. Murphy did not comport with the jury's idea of sound logic, it had the right to so find.

*Id.* at 428 (internal citations omitted).

Much like in *McGuffin*, the only evidence concerning Cronfel's pain and suffering came from Cronfel (or Lown to whom Cronfel related his alleged injuries and pain and suffering). Thus, just as in *McGuffin*, the jury

was "free to disbelieve, and apparently did disbelieve," Cronfel's complaints or whether his complaints were caused by the accident versus something else to which the jury heard evidence.

Another instructive case is *Luna v. Torres*, 2009 Tex. App. LEXIS 6972 (Tex. App.–Corpus Christi August 31, 2009, no pet.), wherein the court of appeals found the jury's zero-damage award was not against the great weight and preponderance of the evidence.

> The police report written at the collision site indicated no injuries to either Cesar or Luna. No ambulance was requested, and neither appellant went to a hospital at any time. The alleged whiplash type injuries were at most soft tissue injuries resulting in negative x-rays. No work restrictions were given, and no prescription pain medications were either prescribed or taken. Neither appellant missed time from work. ***No doctor testified to any injury or objective medical findings***. . . . .
>
> The mere fact of injury does not prove compensable pain and suffering or impairment. A jury may award "zero damages" when the injuries sustained are subjective in nature or there is both subjective and objective evidence of damages. The evidence concerning whether appellants suffered pain as a result of the accident is almost entirely subjective, primarily based on appellants' own personal reports of pain to doctors, and their own testimony.

> *The un-contradicted testimony of an interested witness cannot be considered as doing more than raising an issue of fact unless that testimony is clear, direct, and positive, and there are no circumstances in evidence tending to discredit or impeach such testimony.*

*Id.* at *12-13 (emphasis added; internal citations omitted).

Texas jurisprudence has long held that when the evidence is controverted or the injury is predominantly subjective, Texas courts must uphold jury findings of no damages despite a finding of liability and evidence of injury and damages. *E.g., Crow v. Burnett*, 951 S.W.2d 894, 899 (Tex. App.–Waco 1997, writ denied); *Barrajas v. VIA Metro. Transit Auth.*, 945 S.W.2d 207, 209-10 (Tex. App.–San Antonio 1997, no writ); *Hyler v. Boytor*, 823 S.W.2d 425, 427 (Tex. App.–Houston [1st Dist.] 1992, no writ); *McGuffin v. Terrell*, 732 S.W.2d 425, 428-29 (Tex. App.–Fort Worth 1987, no writ).

Moreover, where the evidence of pain is conflicting, scant, or more subjective than objective, a jury's zero-damages finding is not against the great weight and preponderance of the evidence. *Gonzalez v. Wal-Mart Stores, Inc.*, 143 S.W.3d 118, 123 (Tex. App.–San Antonio 2004, no pet.); *see also Barrios v. King Fisher Marine Serv., L.P.*, 2010 Tex. App. LEXIS 3955 *10

(Tex. App.–Corpus Christi May 27, 2010, pet. denied).

Clearly, the jury either did not believe all of Cronfel's complaints of pain and suffering (and other "injuries"), or was not convinced they were caused by the 2009 accident. There was significant evidence Cronfel had injured the same wrist on at least one occasion prior to the 2009 incident. The jury also heard evidence Cronfel may have injured his wrist during his workout routine and weightlifting regimen. All of these possible sources are wholly unrelated to the collision with Murray's dog, Magnum. Additionally, Cronfel continued to engage in activities which were or could have been the cause of his physical complaints (*e.g.*, water skiing, bicycling, and weightlifting). In sum, the jury's verdict was unquestionably within the law and based on the evidence presented.

D.    The Trial Court's Discovery Sanction Was Not an Abuse of Discretion

Cronfel appears to argue on appeal that he should not have been sanctioned ($5,000.00) for three reasons: (1) he complied with what he thought the order from the trial court should have been – and not what the trial court actually ordered; (2) it was based on his refusal to disclose privileged mental health records – which were not even requested by Murray; and (3) $5,000.00 was excessive and not explained to Cronfel's

63

satisfaction.

All of Cronfel's contentions are misguided and fail when viewed in the light of the entire history of the litigation. Specifically, the Court must take into consideration the multiple motions to compel, multiple hearings, Cronfel's refusal to comply with *two* separate orders, Cronfel's unilateral change to the medical authorization he was ordered to sign, and his mischaracterization of the medical records being sought.

The inherent powers of a trial court are those which it may call upon to aid in the exercise of its jurisdiction, in the administration of justice, in the preservation of its independence and integrity, and to prevent any significant interference with the traditional core functions of Texas courts. *Public Util. Comm'n v. Cofer*, 754 S.W.2d 121, 124 (Tex. 1988); *Kutch v. Del Mar College*, 831 S.W.2d 506, 510 (Tex. App.–Corpus Christi 1992, no writ).

"By rule, statute, and their own inherent power, trial courts have broad authority to sanction litigants for specific misconduct." *In re Does 1-10*, 242 S.W.3d 805, 817 (Tex. App.–Texarkana 2007, no pet.); *In re N.R.C.*, 94 S.W.3d 799, 807 fn. 4 (Tex. App.–Houston [14th Dist.] 2002, pet. denied); *see also Onstad v. Wright*, 54 S.W.3d 799, 804 (Tex. App.–Texarkana 2001, pet. denied). A trial court has inherent power to sanction to the extent

necessary to deter, alleviate, and counteract bad faith abuse of the judicial process. *In re Bennett*, 960 S.W.2d 35, 40 (Tex. 1997); *Dallas County Constable v. Kingvision Pay-Per-View*, 219 S.W.3d 602, 610 (Tex. App.–Dallas 2007, no pet.). To support the entry of sanctions under a court's inherent powers, the trial judge must find that the party caused significant interference with the legitimate exercise of the traditional core functions of the court. *Eichelberger v. Eichelberger*, 582 S.W.2d 395, 398 (Tex. 1979); *IFC Credit Corp. v. Specialty Optical Sys.*, 252 S.W.3d 761, 772 (Tex. App.–Dallas 2008, pet. denied).

The core functions of the judiciary are to hear evidence, decide issues of fact raised by pleadings, decide questions of law, enter final judgments, and enforce those judgments. *Armadillo Bail Bonds v. State*, 802 S.W.2d 237, 239-40 (Tex. Crim. App. 1990); *Finlan v. Peavy*, 205 S.W.3d 647, 652-53 (Tex. App.–Waco 2006, no pet.). Additionally, a trial court's core functions include "the management of its docket and the issuance and *enforcement of its orders*." *See In re K.A.R.*, 171 S.W.3d 705, 715 (Tex. App.–d Houston [14th Dist.] 2005, no pet.) (emphasis added).

The review of a trial court's sanction based on its inherent power is conducted under an abuse of discretion standard. *Kutch*, 831 S.W.2d at 512.

65

Moreover, the reviewing court must review the entire record and view the evidence most favorably to the trial court's ruling. *Id.*; *Vaughn v. Tex. Employment Comm'n*, 792 S.W.2d 139, 143 (Tex. App.–Houston [1st Dist.] 1990, no writ); *see also Lawrence v. Kohl*, 853 S.W.2d 697, 700-701 (Tex. App.–Houston [1st Dist.] 1993, no pet.).

Furthermore, a court may impose sanctions for a party's failure to fully comply with a discovery request. *See generally* TEX. R. CIV. P. 215. If the court finds a party is abusing the discovery process in seeking, making or resisting discovery, the court may impose an "appropriate" sanction. TEX. R. CIV. P. 215.3. The Texas Supreme Court has stated that this rule gives "trial courts broad authority to curb [discovery] abuse." *Braden v. Downey*, 811 S.W.2d 922, 930 (Tex. 1991). There are three purposes for discovery sanctions: (1) to secure compliance with discovery rules; (2) to deter other litigants from similar misconduct; and (3) to punish violators. *Chrysler Corp. v. Blackmon*, 841 S.W.2d 844, 849 (Tex. 1992).

Of course, a sanction cannot be excessive and should not be assessed without appropriate guidelines. *See Low v. Henry*, 221 S.W.3d 609, 620 (Tex. 2007) (discussing limitations on sanctions under Texas Rule of Civil Procedure 215 and chapter 10 of the Texas Civil Practice and Remedies

Code); *Greiner v. Jameson*, 865 S.W.2d 493, 499 (Tex. App.–Dallas 1993, writ denied) (noting that the rule 215 requirement that sanctions be just also applies to the court's inherent power to sanction); *see also State v. PR Invs.*, 180 S.W.3d 654, 673 (Tex. App.–Houston [14th Dist.] 2005), aff'd, 251 S.W.3d 472 (Tex. 2008).

In order for a sanction to be just, there must be a direct relationship between the offensive conduct and the sanction imposed; and the sanction imposed must not be excessive. *TransAmerican v. Powell*, 811 S.W.2d 913, 916 (Tex. 1991). In other words, the punishment should fit the crime; the sanction must be directed against the abuse and toward remedying the prejudice caused to the innocent party. *Thompson v. Davis*, 901 S.W.2d 939, 940 (Tex. 1995).

On review, the appellate court must recognize that, in assessing sanctions, the trial court is entitled to consider the entire course of the litigation. *Scott Bader, Inc. v. Sandstone Prods.*, 248 S.W.3d 802, 814 (Tex. App.–Houston [1st Dist.] 2008, no pet.); *Broesche v. Jacobson*, 218 S.W.3d 267, (Tex. App.–Houston [14th Dist.] 2007, pet. denied); *see Berry-Parks Rental Equip. Co. v. Sinsheimer*, 842 S.W.2d 754, 757 (Tex. App.–Houston [1st Dist.] 1992, no writ).

Here, the record is replete with evidence of Murray's efforts to obtain the medical records (and specifically of those of Lown) needed to defend himself against Cronfel's allegations and the damages Cronfel sought to have assessed against him. Beginning with simple interrogatories and requests for production, this discovery tale unnecessarily mushroomed into depositions on written questions, numerous motions to compel, broken agreements to produce the records, multiple hearings, and two court orders – both of which Cronfel failed to follow. To suggest the trial court abused its discretion in imposing a $5,000.00 sanction – at the end of this trail of waste of resources (on the part of Murray and the trial court) – is wholly without merit.

## CONCLUSION AND PRAYER

For the foregoing reasons, Murray asks the Court to affirm the trial court's final judgment, as well as its discovery sanction against Cronfel, in all respects and for such further and other relief to which he is justly entitled.

Respectfully submitted,

**WALTERS, BALIDO & CRAIN, L.L.P.**

_____*/s/ Gregory R. Ave*_____

**GREGORY R. AVE**
State Bar No. 01448900
**JAY R. HARRIS**
State Bar No. 00793907
Meadow Park Tower, Suite 1500
10440 North Central Expressway
Dallas, Texas 75231
Telephone Number (214) 347-8310
Facsimile Number (214) 347-8311
greg.ave@wbclawfirm.com
jay.harris@wbclawfirm.com

ATTORNEYS FOR APPELLEE
PATRICK C. MURRAY

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), the undersigned certifies that this brief complies with the type-volume limitations of Texas Rule of Appellate Procedure 9.4(i)(2)(B).

Exclusive of the exempt portions identified by Texas Rule of Appellate Procedure 9.4(i)(1), this brief contains <u>13,054</u> words, including footnotes, headings, and quotations, and this certificate and the certificate of service which follows.  In providing this word-count, the undersigned is relying the word count generated by the computer program used to prepare the motion.

This brief has been prepared in proportionally spaced type, 14-point text, and in Book Antiqua font, using the computer program known as Microsoft Word 2010.

Acknowledged: November 13, 2015.

*/s/ Gregory R. Ave*
Gregory R. Ave

## CERTIFICATE OF SERVICE

On November 13, 2015, a true and correct copy of the foregoing was sent to all parties and counsel of record in accordance with the Texas Rules of Civil Procedure:

Paul T. Morin, Esquire                                    *Via E-Serve*
Paul T. Morin, P.C.
503 West 14th Street
Austin, Texas 78701


Guillermo Ochoa-Cronfel, Esquire                          *Via E-Serve*
The Cronfel Law Firm
2700 Bee Caves Road, Suite 103
Austin, Texas 78746


ATTORNEYS FOR APPELLANT
GUILLERMO OCHOA-CRONFEL

                                            */s/ Gregory R. Ave*
                                              Gregory R. Ave